2006-NMSC-019

134 P.3d 746

**IN THE MATTER OF PAMELA A.G., a child,**

State of New Mexico, ex rel., Children, Youth and Families Department, Petitioner–Respondent,

v.

Pamela R.D.G. and Frank G., Respondents–Petitioners.

In the Matter of Pamela A.G., a child,

State of New Mexico, ex rel., Children, Youth and Families Department, Petitioner–Respondent,

v.

Frank G., Respondent–Petitioner.

Nos. 29,018, 29,042.

Supreme Court of New Mexico.

April 20, 2006.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM, Jane Bloom Yohalem, Santa Fe, NM, for Petitioners.

Rebecca J. Liggett, Santa Fe, NM, for Respondent.

**OPINION**

CHÁVEZ, Justice.

{1} In this neglect and abuse proceeding we consider whether the Petitioners' procedural due process rights were violated when Child's out-of-court statements were admitted to prove allegations of sexual abuse. Petitioners contend their due process rights were violated because four hearsay statements of Child were admitted without giving them an opportunity to question Child regarding the allegations. The Children's Court admitted the statements under the catch-all exception to the hearsay rule, finding that the statements by the child were spontaneous, consistent, and contained language that a child four years of age normally would not use, thus concluding the statements were trustworthy and reliable. The Court of Appeals affirmed and held that the Children's Court adequately safeguarded the Petitioners' due process rights by investigating the reliability of the statements before admitting the statements as evidence of sexual abuse. We affirm the Court of Appeals. Although we agree with the hearsay analysis employed by the Court of Appeals, we take this opportunity to emphasize those procedural safeguards that are necessary to afford a minimum level of due process in an neglect and abuse proceeding when the child does not testify.

{2} Petitioners are the natural grandparents and adoptive parents of Child (hereinafter referred to as "Parents" and/or "Mother" and/or "Father"). In November 2001, nine days before Child's fourth birthday, the New Mexico Children, Youth and Families Department ("CYFD") filed an Abuse and Neglect Petition against Parents and took Child into custody. The Petition was based on allegations of unsafe, unsanitary, and uninhabitable living conditions. Approximately four months later, after Child had lived with two different sets of foster parents, CYFD amended the Abuse and Neglect Petition to allege that Father had sexually abused Child, and Mother failed to protect Child from the abuse.

{3} The allegations of sexual abuse were based on statements made by Child to four different individuals: first to her foster mother, then to a CYFD social worker, later during a "Safe House" interview, and finally to Child's therapist. The initial statement was made spontaneously to the foster mother while Child was taking a bath. The foster mother noticed that Child was "trying to stick a washcloth up her bottom" and asked Child what she was doing. Child announced that she was "sexing" herself. When the foster mother asked Child, "Who told you about that?", Child said, "My dad Chico," referring to her natural grandfather/adopted father. Child announced, "This is the way my mom Pam and my dad Chico have sex, my dad sexes my mom back here," pointing to her anus, and "He sexes my mom here too," pointing to her vaginal area. Child went on to state, "And when my dad was sexing me, I tried to push him off because he was too heavy, and I kept saying 'No! No!' but he wouldn't get off and I couldn't push him off."

{4} The foster mother then called the CYFD social worker, who visited Child that same day. The social worker asked Child what she had talked to her foster mother about during her bath. Child told the social worker "Chico tried to sex me" and that

Chico had gotten on top of her, and that she had tried to push him off but he was too big. Child said that Chico had "put his here," pointing to her crotch. Child also told the social worker that her mom Pam was in the room and had told her "to get up, or get off and pull up her pants."

{5} Twelve days later Child was taken to a "Children's Safe House" where she was interviewed on videotape by a trained clinical forensic interviewer. The interviewer did not ask Child about the allegation of sexual abuse until Child brought it up herself. Child again said that her dad Chico had "poked her 'wee-wee' (which she identified by pointing to her crotch) with his 'wee-wee' (which she described as something that comes out of his pants)." Child also reported that she had seen Father and Mother "f—ing" and that Mother had seen Father "f—ing" Child.

{6} The fourth statement was made to Child's therapist. Child told the therapist that "Chico put his wee to mine and I put mine to his." During a private therapy session, Child also spontaneously told her therapist "I don't like it when Chico f—ks me," and that "Mom was mad because Chico f—ked me."

{7} Prior to the adjudication hearing on the sexual abuse allegations, CYFD gave notice to Father and Mother of its intent to offer the Child's statements as evidence under the hearsay rule. The notice did not indicate which hearsay exception CYFD was relying on, but Rule 11–803(X) NMRA, requires prior notice to an adverse party. Rule 11–804 B(5) NMRA, similarly requires notice to the adverse party when the declarant is unavailable. These two exceptions, often called "catch-all" or residual exceptions, provide that statements not specifically covered by any of the other hearsay exceptions, but with the "equivalent circumstantial guarantees of trustworthiness" of the other hearsay exceptions, may be admissible under circumstances when:

(1) the statement is offered as evidence of a material fact;

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of these rules and the interests of justice will be served by the admission of the statement into evidence.

Rule 11–803(X) NMRA; *see also* Rule 11–804 B(5) NMRA.

{8} Father filed a Motion in Limine to exclude the hearsay statements of Child, arguing the statements lack the "equivalent circumstantial guarantees of trustworthiness" required by 11–803(X); admission of the statements would deny Father due process because of his lack of opportunity to participate in the questioning of Child; and Child was not competent to testify. The Children's Court judge considered the motion at the beginning of the adjudicatory hearing. After hearing argument the judge decided to reserve his ruling until he heard the evidence relating to the statements.

{9} The foster mother, the CYFD social worker, the safe house interviewer, and Child's therapist all testified regarding the statements made to them by Child. In addition, Child's therapist offered uncontroverted testimony that it would be hurtful, rather than helpful, to have Child testify, and stated that in her opinion, it was not likely that Child would say anything in the court setting. At the conclusion of the testimony, the Children's Court judge ruled that Child's hearsay statements were admissible. The court found the circumstances surrounding Child's statements made them trustworthy, particularly due to the spontaneity, repetition, and consistency of the statements, and the fact that a child of age three or four would not normally know about sexual matters. In light of all the evidence, the court found the statements reliable and admissible under 11–803(X). The court then concluded that clear and convincing evidence supported the allegations of neglect and abuse as defined in the Children's Code, NMSA 1978, § 32A–4–2(B)(3) and (4), and § 32A–4–2(E)(3)(2006).[1]

---

1. § 32A–4–2(B)(3) defines an abused child as one "who has suffered sexual abuse or sexual exploi-

tation inflicted by the child's parent, guardian or custodian." § 32A–4–2(B)(4) defines an abused

{10} The question we consider is whether Parents' due process rights were violated when Child's out-of-court statements were admitted without Parents having an opportunity to question or confront Child. We review the constitutional claim of denial of due process de novo. *State ex rel. Children, Youth and Families Dep't v. Mafin M.*, 2003–NMSC–015, ¶ 17, 133 N.M. 827, 70 P.3d 1266.

{11} The interest of parents in the care, custody, and control of their children is a fundamental liberty interest. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Whenever a proceeding affects or interferes with the parent-child relationship courts must be careful to afford constitutional due process. *State ex rel. Children, Youth and Families Dep't v. Stella P.*, 1999–NMCA–100, ¶ 14, 127 N.M. 699, 986 P.2d 495. Although we recognize the proceeding at issue was not for the termination of parental rights, the statutory scheme enacted by our Legislature to protect children and adjudicate parental rights "represents a continuum of proceedings which begins with the filing of a petition for neglect and abuse and culminates in the termination of parental rights." *State ex rel. Children, Youth and Families Dep't v. Maria C.*, 2004–NMCA–083, ¶ 25, 136 N.M. 53, 94 P.3d 796. While it has been held that termination proceedings must be conducted in a constitutional manner, *Mafin M.*, 2003–NMSC–015, ¶ 18, 133 N.M. 827, 70 P.3d 1266, neglect and abuse proceedings must also be conducted in a manner that affords the parents constitutional due process. The question is how much process is due, and did Parents in this case receive the minimum level of due process?

{12} The amount of process due depends on the particular circumstances of each case because procedural due process is a flexible right. *See State ex rel. Children, Youth and Families Dep't v. Lorena R.*, 1999–NMCA–035, ¶ 17, 126 N.M. 670, 974 P.2d 164. Due process requires "timely no-

tice reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by constitution or statute; and a hearing before an impartial decisionmaker." *Lorena R.* 1999–NMCA–035, ¶ 26, 126 N.M. 670, 974 P.2d 164 (quoting *In re L.V.*, 240 Neb. 404, 482 N.W.2d 250, 257 (1992)). It is the right to confront and cross-examine adverse witnesses that is the main issue in this case. Because neglect and abuse proceedings are civil proceedings, the Confrontation Clause of the Sixth Amendment of the U.S. Constitution, as interpreted in *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that out-of-court statements by witnesses are barred under the Confrontation Clause, unless witness is unavailable and defendant had prior opportunity to cross-examine witness, regardless of whether such statements are deemed reliable by the court), is not at issue here. *See In re Esperanza M.*, 1998–NMCA–039, ¶ 15, 124 N.M. 735, 955 P.2d 204. The opportunity to confront a witness in a civil neglect and abuse proceeding is not an absolute right. Instead the right requires that parents be given a reasonable opportunity to confront and cross-examine a witness, including a child witness.

{13} To determine whether Parents' right to confront and cross-examine a witness comported with the reasonableness requirement of due process, we employ the balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See Mafin M.*, 2003–NMSC–015, ¶ 19, 133 N.M. 827, 70 P.3d 1266. This balancing test requires the weighing of three factors. One, the private interest at stake. Two, the government's interest. Three,

child as one "whose parent has knowingly, intentionally or negligently placed the child in a situation that may endanger the child's life or health." § 32A–4–2(E)(3) defines a neglected child as one "who has been physically or sexually abused,

when the child's parent, guardian or custodian knew or should have known of the abuse and failed to take reasonable steps to protect the child from further harm."

whether the procedures used increased the risk of erroneous deprivation of the private interest. *See Mathews*, 424 U.S. at 335, 96 S.Ct. 893. Parents' interest in maintaining "a parental relationship with [their] children is a fundamental right that merits strong protection." *Mafin M.*, 2003–NMSC–015, ¶ 20, 133 N.M. 827, 70 P.3d 1266 (quoting *State ex rel. Children, Youth and Families Dep't v. B.J.*, 1997–NMCA–021, ¶ 11, 123 N.M. 99, 934 P.2d 293). The government's interest in protecting the welfare of children is equally significant. *See State ex rel. Children, Youth and Families Dep't v. Anne McD.*, 2000–NMCA–020, ¶ 23, 128 N.M. 618, 995 P.2d 1060. Therefore, whether Parents were given due process turns on whether the procedures used for the admission of Child's hearsay statements increased the risk of an erroneous finding of abuse which could lead to the deprivation of Parents' fundamental right to maintain their relationship with Child, and whether additional procedural safeguards would eliminate or lower that risk. *Id.* ¶ 24.

■ {14} Significantly, whether Parents were afforded due process does not depend on a showing that they would have prevailed had they cross-examined Child or excluded the hearsay statements. Parents "need only demonstrate that there is a reasonable likelihood that the outcome might have been different." *Maria C.*, 2004–NMCA–083, ¶ 37, 136 N.M. 53, 94 P.3d 796 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 544, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)).

■ {15} In this case, the Children's Court judge analyzed the admissibility of Child's statements following the procedure required by Rule 11–803(X) for determining whether the statements were trustworthy and reliable. Parents contend that without the right to confront and cross-examine Child this procedure was inadequate to eliminate or minimize the risk of an erroneous finding of abuse. "In evaluating whether this procedure created a risk of an erroneous deprivation ... we look to the purpose of confrontation and cross-examination. The purpose is to ensure the integrity of the fact-finding process by 'subjecting it to rigorous testing in the context of an adversary proceeding

before the trier of fact.' " *In re A.M.*, 13 P.3d 484, 488 (Okla.2000) (quoting *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)). The Oklahoma court concluded: "It is evident that any restriction a judge places on the opportunity for face-to-face confrontation and cross-examination of adverse witnesses enhances the risk of an erroneous deprivation of parental rights." *Id.* Although we agree with this statement, in this case the Children's Court judge did not restrict Parents' opportunity for cross-examination. Neither parent called Child as a witness, nor did they ask permission of the court to allow them to question Child. Instead, they simply sought to exclude Child's hearsay statements. It was only during closing arguments that Parents suggested that the judge himself interview Child before admitting the out-of-court statements. *Cf. In re Tamara G.*, 295 A.D.2d 194, 200, 745 N.Y.S.2d 6 (N.Y.App.Div.2002) (finding that the balancing of interests in a sexual abuse case weighed in favor of examining the 11–year–old daughter, at least in camera, in order to clarify numerous unexplained inconsistencies in her statements). Indeed, Parents did not indicate below nor have they indicated on appeal what questions they might ask Child, making it difficult to determine what value, if any, cross-examination of this four-year-old child would have offered. Although there are situations where cross-examination, even of a very young child, will enhance the integrity of the fact-finding process, Parents have failed to articulate with any degree of specificity how confrontation of Child would have enhanced the fact-finding process in this case.

■ {16} In this case the Children's Court judge did not admit the hearsay statements as substantive evidence until he was convinced of their reliability under Rule 11–803(X). He made the finding that the hearsay statements were inherently reliable based on Child's age, the manner in which the statements were made, and the consistency of the statements. The trial judge's adherence to the requirements of Rule 11–803(X) helped to ensure due process for Parents. As detailed previously, Child's statements were unambiguous in both the descrip-

tion of the abuse and the identity of the abuser. The terms used by Child to describe the details of the abuse were consistent with her age, refuting any implication that Child was coached or influenced in her statements. The foster mother testified to behavior by Child that included frequent masturbating with her hand, with her dolls and with the family dog. Child also simulated acts of sexual intercourse between her unclothed dolls. The program therapist testified that Child exhibited sexualized behavior, and that this would typically be a learned activity in a four-year-old child. The therapist also testified that Child suffered from nightmares and sleep disturbances, behaviors she found consistent with Post Traumatic Stress Disorder caused by a traumatic event, such as sexual abuse. Here, Child's sexualized behavior and the expert testimony of the therapist that Child's behavior was consistent with child sexual abuse make it more probable that Child was abused and supports a logical inference that the act of abuse described in Child's hearsay statement occurred. Child's identification of Father as the abuser was also consistent and spontaneous, as were Child's statements regarding Mother's knowledge of the abuse. This evidence provided the circumstantial guarantee of trustworthiness required by the hearsay catch-all exceptions.

{17} In addition, the safe house interview was both audio and video recorded, affording Parents the opportunity to point out any impropriety in the questioning techniques employed by the interviewer. No such improprieties have been noted by Parents, and thus we are not persuaded that Parents have shown that admission of the out-of-court statements increased the risk of an erroneous deprivation of their relationship with Child.

{18} Although it is almost always true that the integrity of the fact-finding process is enhanced by rigorous testing in the context of an adversary proceeding before the trier of fact, as this case demonstrates there are circumstances when other procedural protections and safeguards must supply the "scrupulous fairness" required when the State "interferes with a parent's

right to raise their children." *Maria C.,* 2004–NMCA–083, ¶ 50, 136 N.M. 53, 94 P.3d 796 (citing *Lorena R.,* 1999–NMCA–035, ¶ 19, 126 N.M. 670, 974 P.2d 164). The trial judge must determine the proper procedure and safeguards to be utilized in each case, based on factors such as the age of the child, the nature of the parent-child relationship, and the particular emotional state of the child. *See In re Michael C.,* 557 A.2d 1219, 1221 (R.I.1989) (discussing the age of child, the potentially violent relationship between father and child, and possible psychological trauma to the child). Although Rule 11–803(X) does not require a finding of unavailability, the trial judge should probe for an explanation as to why a child will not testify, such as the explanation offered here by the Child's therapist. Even in civil cases, in-court confrontation is preferred. We emphasize that trial judges should explore alternatives for the questioning of a child in order to help the fact-finder test the reliability of the child's statements while also protecting the child's emotional state. Alternative procedures such as videotaped depositions or testimony in camera have been used to prevent possible psychological trauma to the child. *See In re C.K.,* 164 Vt. 462, 671 A.2d 1270, 1275 (1995) (stating that use of alternative procedures for testimony is left to discretion of trial judge); *In re Michael C.,* 557 A.2d at 1220 (describing procedures used for a thirteen year old boy accusing his father of sexual abuse to testify in camera, answering questions written by father's attorney); *In re A.M.,* 13 P.3d at 488 (recognizing that due process does not entitle a parent to personally confront and cross-examine a child witness if the child would be traumatized by the experience).

{19} In addition, this Court agrees that:

"[w]hile we do not expect CYFD to act as [parent's] counsel, we remind counsel that their role as an attorney for CYFD is analogous to the role of prosecuting attorneys. The prosecutor's obligation is to protect not only the public interest but also the rights of the accused. Similarly, CYFD must seek not only to protect the children involved; they must see to it also

that the parents are dealt with in scrupulous fairness."

*Maria C.*, 2004–NMCA–083, ¶ 51, 136 N.M. 53, 94 P.3d 796 (internal quotations and citations omitted). We note that the Legislature in 2005 amended the Children's Code related to the investigation of reports of child abuse to include an obligation for CYFD to notify parents of a safe house interview, unless CYFD determines that notification would adversely affect the safety of the child or compromise the investigation. NMSA 1978, § 32A–4–5(F)(2005). Although the legislation is silent on what role the parents may play during the interview, this may provide an adequate opportunity for parents or their attorneys to ask questions of the child through the safe house interviewer, provided careful procedures are in place to avoid any manipulation or intimidation of the child by the parents. In this case, parents do not point to any improprieties in the questioning of Child during the safe house interview, and we find none.

{20} Although Parents' due process challenge centers around their right to confront Child, we find it significant to our due process analysis in this case that Parents were allowed to cross-examine the hearsay witnesses and to challenge the reliability of the methods in which the statements were obtained from Child. Parents were also provided with proper notice, the assistance of counsel, and the opportunity to review and present evidence. Combined, these factors weigh heavily against a reasonable likelihood that the outcome would have been different if any additional procedures had been utilized. We conclude Parents were not denied due process. The Court of Appeals is affirmed.

{21} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices.